'09 CV 7801

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
FOLKSTONE MARITIME LTD,

                                    Plaintiff,          09 CV

-v-                                                     **VERIFIED COMPLAINT**

TRANSAMMONIA AG,                                        09 CV 7801 (DLC)

                                    Defendant.
------------------------------------------------------------------x

Plaintiff, FOLKSTONE MARITIME LTD, (hereinafter "FOLKSTONE"), by its

attorneys, CHALOS & CO, P.C., as and for its Verified Complaint against Defendant,

TRANSAMMONIA AG, (hereinafter "TRANSAMMONIA"), alleges upon information and

belief as follows:

<u>JURISDICTION</u>

1.    The Court has subject matter jurisdiction by virtue that the underlying claim

herein is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules

of Civil Procedure and within the admiralty and maritime jurisdiction of this Court under 28

U.S.C. § 1333.

<u>THE PARTIES</u>

2.    At all times material hereto, Plaintiff, FOLKSTONE, was and still is a foreign

business entity with a principal place of business in Nicosia, Cyprus.

3.    At all times material hereto, Defendant, TRANSAMMONIA, was and still is a

foreign business entity with a principal place of business at Bahnhofstrasse 1, CH-8852,

Altendorf, Switzerland.

FACTS AND CLAIM

4.       On or about April 1, 2009, FOLKSTONE, as Owners, and TRANSAMMONIA, as charterers entered into a voyage charterparty for one (1) voyage of the M/V PONTOKRATIS from Yuzhny to "1 safe berth/anchorage Cai Lan." *A copy of the charterparty is annexed hereto as Exhibit "1".*

5.       This agreement is a maritime contract.

6.       After discharging at one (1) anchorage, in accordance with the charterparty, TRANSAMMONIA directed the vessel to discharge at three (3) additional berths.  As the result of these directions, TRANSAMMONIA incurred shifting charges and expenses.

7.       The vessel also incurred expenses for pilotage, bunkers consumption, cranes, warping and detention, all of which were due and owing to FOLKSTONE by TRANSAMMONIA.

8.       In total, TRANSAMMONIA owes FOLKSTONE a balance of USD $59,396.45 with respect to the April 1, 2009, charterparty. *A copy of the final invoice to TRANSAMMONIA is annexed hereto as Exhibit "2".*

9.       Despite FOLKSTONE's repeated requests for the payment of outstanding demurrage and lost profit damages, TRANSAMMONIA has failed to make said payments.

11.       Pursuant to the terms of the above listed agreement, all disputes arising there under are to be submitted to London arbitration with English law to apply.

12.       FOLKSTONE will shortly be commencing arbitration in London based upon its underlying claims.

13.       This action is brought in order to obtain jurisdiction over Defendant and also to obtain security for Plaintiff's claims and in aid of London arbitration proceedings.

Chalos & Co ref: 2125.005                                                           2

14.    English law, including but not limited to Section 63 of the English Arbitration Act of 1996, provides that a prevailing party is entitled to interest, costs and legal fees.

15.    As best as can now be estimated, the Plaintiff FOLKSTONE expects to recover the following amounts in London arbitration from Defendant TRANSAMMONIA:

| | | | |
|---|---|---|---|
| A. | Principal claim: | $ | *59,396.45* |
| B. | Estimated interest on Principal claim: 3 years at 7.5%, compounded quarterly | $ | *14,832.27* |
| C. | Estimated attorneys' fees: | $ | *25,000.00* |
| D. | Estimated arbitration costs: | $ | *25,000.00* |
| | **Total Claim** | **$** | **124,228.72** |

16.    Therefore, FOLKSTONE's total claim for breach of the maritime contract against Defendant TRANSAMMONIA is in the aggregate USD $124,228.72.

<u>BASIS FOR ATTACHMENT</u>

17.    Defendant cannot be found within this district within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but Defendant is believed to have or will have during the pendency of this action, certain assets, accounts, freights, monies, charter hire, credits, effects, payment for bunkers, goods or services, bills of lading, cargo and the like belonging to, claimed by, or for the benefit of, the Defendant within this District held by various parties, as garnishees, including by not limited to electronic fund transfers.

18.    Defendant TRANSAMMONIA is continuously engaged in international shipping and conducts business in U.S. Dollars. Nearly all companies engaged in the international

shipping industry transact business in U.S. Dollars and therefore regularly have assets in New York City. Dollars are the *lingua franca* of international commerce.

19.    All international U.S. dollar transfers are processed by intermediary banks in the United States, mainly in New York City. The Clearing House Interbank Payment System represents that it processes 95% of those transfers.

20.    Plaintiff believes that some of these assets of Defendant TRANSAMMONIA, to wit: accounts; bank accounts; monies; charter hire; credits; debts owed to the defendants; effects; payments for bunkers, cargo, goods or services; debts; unmatured debts; bills of lading; payments from the purchasers of cargoes; freight and/or hire payments to or from owners of vessels, or charterers, to, from, or for the benefit of, Defendant and/or Clearing House Interbank Payment System (CHIPS) credits or funds being transferred through intermediary banks, are located in this District in the possession of garnishees, including: ABN AMRO BANK, American Express Bank, Bank of America, Bank of China, Bank of New York, Bank of Tokyo Mitsubishi UFJ Ltd., Barclay's Bank, BNP Paribas SA, Calyon, Calyon Financial, Inc., Citibank N/A, Credit Suisse Securities (USA) LLC, Deutsche Bank, HSBC (USA), JPMorgan Chase Bank, Mashreqbank, Societe Generale, Standard Chartered Bank, UBS AG, U.S. Bank, Wachovia Bank, and Wells Fargo Bank.

WHEREFORE, Plaintiff prays:

A.    That process in due form of law issue against the Defendant, citing it to appear and answer under oath all, and singular, the matters alleged in the Verified Complaint;

B.    That since the Defendant cannot be found within the District, as set forth in the Declaration of George M. Chalos (*a copy of which is annexed hereto as Exhibit "3"*), and pursuant to Rule B and Rule E of the Supplemental Rules of Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime

Attachment and Garnishment pursuant to Rule B and Rule E of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all of the Defendant tangible or intangible property or any other funds held by any garnishees in the district which are due and owing, or other property of, or for the benefit of, the Defendant, up to the amount of USD $1124,228.72 to secure and satisfy the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B and Rule E answer the matters alleged in the Complaint;

C.    That Plaintiff may have such other, further and different relief as may be just and proper.

Dated: Oyster Bay, New York
September 10, 2009

CHALOS & CO, P.C.
Attorneys for Plaintiff
FOLKSTONE MARITIME LTD

By: _____

George M. Chalos (GC-8693)
123 South Street
Oyster Bay, New York 11771
Tel: (516) 714-4300
Fax: (516) 750-9051
Email: gmc@chaloslaw.com

# EXHIBIT 1

TA-1 (AG)
© Transammonia, Inc. 2000



**TRANSAMMONIA**
**350 PARK AVENUE**
**NEW YORK, NY 10022**

### FERTILIZER CHARTER PARTY

Dated:- *1ˢᵗ April 2009*

| | |
|---|---|
| **OWNERS** | AGREEMENT BETWEEN:- *"FOLKSTONE MARITIME LTD., NICOSIA, CYPRUS"* as Owners of the *Cyprus* flag Vessel M.V. *"PONTOKRATIS"* of *29,198* metric tons summer DWAT ~~or of a motor ship to be nominated~~ as hereinafter |
| **CHARTERER** | provided (herein called the "Vessel") and *"TRANSAMMONIA AG, ALTENDORF, SWITZERLAND" or guaranteed nominee* as Charterers. Owners warrant that the Vessel is now trading and is expected to be ready to load under this Charter about *6-7ᵗʰ April 2009 WP AGW UCE* |
| **LOADING RANGE** | The vessel shall proceed directly and with due dispatch to:- *1-2 safe berths Yuzhny.* *Any shifting expenses between first loading berth/anchorage to second loading berth/anchorage to be for Owners account but time used to count as laytime.* *Owners to verify themselves about any restrictions prevailing at ports/berths both ends.* |
| **TONNAGE** | and shall there load always afloat from the Agent or nominee of the Charterers *24,500* metric tons of 1,000 kilograms, 5% /~~10%~~ more or less at Owners' /~~Charterers~~ option (as near thereto as Shippers can load without splitting contents of railroad cars), a cargo of:- |
| **CARGO** | *Bulk Urea* |

such cargo not to exceed either the cubic or deadweight cargo capacity of the Vessel as specified herein; such cargo to be the sole cargo of the vessel, with no completion cargo to be loaded; and upon completion of loading, the Vessel shall therewith proceed directly and with due dispatch to:-

| | |
|---|---|
| **DISCHARGE** | *1 safe berth/anchorage Cai Lan where Charterers warrant 10m salt water arrival draft. Owners warrant vessel can arrive Cai Lan with maximum 10m SWAD.* *Routing via Suez/Gulf of Aden at Owner's risk and expense.* *Owners to verify themselves about any restrictions prevailing at ports/berths both ends.* and shall there deliver *always afloat* the cargo in accordance with the custom of the port, at such wharves, piers, jetties, anchorage's or other places, or in such docks ~~or into lighters~~ as may be ordered by the Charterers or their Agent or nominees after arrival. |
| **FREIGHT** | Charterers to pay freight on the basis of the net Bill of Lading weight at the rate of:- U.S.$ *45.00* (U.S. Dollars *forty-five*) and (U.S. cents *zero*) per metric ton *FIO*, in full of primage, port charges, dues, pilotage and charges whatsoever of like nature to:- |
| **ACCOUNT DETAILS** | *Owner's nominated bank account* |

| | |
|---|---|
| **FREIGHT PAYMENT** | Charterers shall pay Owners or their nominees NINETY FIVE PERCENT (90% / 95%) of freight, less commissions, undisputed load port despatch ~~and other undisputed amounts due Charterers~~, within three (3) bank working days after receipt by telex or fax of a freight invoice and after Bills of Lading, marked "FREIGHT *PAYABLE AS PER CHARTER PARTY* ~~PREPAID~~" and "CLEAN ON BOARD" and complying with Clause 31, have been signed and released,~~but always before breaking bulk~~. Owners shall submit, by post or courier *or fax/e-mail*, a final freight account including an original signed invoice and all supporting documents, to be received by Charterers within 180 days of completion of discharge. Failure to do so shall be an absolute bar to and waiver of any claim for balance of freight or demurrage. Charterers or Owners shall pay the net of any amounts due Owners or Charterers (as the case may be) within *30* days after completion of discharge and receipt and agreement of the final freight account and supporting documents, including, but not limited to time sheets and statements of facts for loading and discharge ports. In order for the statement of facts to be considered an authorized document, it must be signed by the master and at least the vessel agent. Freight to be payable without discount and non refundable, ship or cargo lost or not lost. **THIS CHARTER IS FURTHER SUBJECT TO THE FOLLOWING TERMS & CONDITIONS:-** |

> *Charterer's option "Freight Prepaid" Bills of Lading, in which case Bills of Lading to be released upon Owner's receipt of freight*

P. 1          HP LASERJET FAX     14 APR 2009 11:57

**LAYDAYS &**
**CANCELING**

1.　　Should the Vessel not arrive at her loading port and be in all respects ready to load under this Charter on or before noon *24:00 hours* local time on:- *10ᵗʰ April 2009*
the Charterers have the option of canceling this Charter, to be declared not later than one (1) working day after the Vessel gives a valid Notice of Readiness in accordance with Clause 14. Laydays not to commence before:- *7ᵗʰ April 2009*　　　　　　　　　　　　　unless with the written consent of Charterers.

**NOTICES**

2.　　GIVING OF NOTICES - The Master or Owners shall give each of the following notices to Charterers and to Charterers' Agent and such other persons as Charterers designate for each loading port and each discharging port:

A.　　LOADING PORT(S) - On fixing of the Vessel, of the exact quantity of cargo required *together with Master's stowage plan,* and, unless instructed otherwise by Charterers, *daily notice* ~~thereafter 15, 10, 7 and 5 days and 72, 48 and 24/12~~ hours notice of the ~~approximate~~ date on which the Vessel will arrive (ETA) at the loading port.

B.　　DISCHARGING PORT(S) - Upon sailing the last loading port, indicating ETA at first discharging port and expected draft upon arrival and unless instructed otherwise by Charterers, thereafter ~~15, 10, 7 and 5 days and 96~~, 72, *every* 48 ~~and 24/12~~ hours *at noon to send notice* of the ETA at the *first* ~~each~~ discharging port *together with vessel's exact position, followed by 96, 72, 48 and 24 hours definite notice of ETA at the 1ˢᵗ discharge port.*

C.　　The Master or Owners shall immediately give notice of any variation in ETA exceeding ~~24~~ *6* hours from last ETA given.

D.　　Should the vessel fail to comply with this clause and any delay results at load or discharge ports, such delay shall not count as laytime or time on demurrage.

E.　　Except as otherwise specified herein, all notices required or permitted hereunder shall be given by cable or telex or fax to the following addresses, or to any other address specified by Charterers by notice:

**Loading Port(s):**

*to be advised*

**Discharging Port(s):**

*to be advised*

**GENERAL EXCEPTION**

3.    The acts of God, public enemies, the restraints of rulers, princes and people, strike or lockout of crew, pirates, robbers and arrests, fire on land or sea, and every danger and accident of the sea, river, machinery, boilers, navigation and latent defects in the hull or machinery of whatever nature or kind mutually excepted; barratry of Master or crew, stranding, collision and other events embraced specifically or by reference in Clause 32 are also excepted but nothing in this Charter shall exempt the Owners from liability for failure to perform any of the duties imposed on carriers by the Carriage of Goods by Sea Act. The Vessel shall have liberty to tow and to be towed and to assist vessels in all situations. The Vessel shall have liberty to bunker at any port or ports en route, consistent with the P. & I. Bunkering Clause, attached, so long as such bunkering shall not cause unusual delay in the Vessel arriving at her loading or discharging ports.

**OTHER EXCEPTION**

4.    Any of the following causes are excepted, regardless of where they *occur, directly affecting the performance of this Charter Party:* strikes or lockouts at the Shippers' or Suppliers' mines or factory, on railways, trucks or barges, or at the ports of loading or discharging; war or effects of war, revolution, civil commotion; breakdown on or stoppage or shortage of railways, trucks or barges; interruptions, stoppage or breakdowns at the factory of the Shippers' or the Suppliers' now or hereafter under contract; stoppage or destruction of goods in transit; epidemic, frost, fire, cyclones, storms, floods, earthquakes, unavoidable accidents to machinery or equipment, or other unavoidable hindrances or delays in mining, manufacturing, transporting, loading, discharging or receiving the material or goods; restraints of established authorities; any delay caused by the Vessel, Master or crew; and any other causes ~~whatsoever or howsoever~~ arising happening without the fault of the Charterers preventing or delaying the mining or manufacturing, supplying, transporting, loading, discharging or receiving of the cargo. Charterers shall not be liable for any delay, loss, ~~dead-freight~~ or other damage resulting from any such excepted causes and time lost by reason thereof shall not count as laytime or time on demurrage. *Charterer's to provide evidence thereof.*

**DISBURSEMENTS**

5.    Owners shall pay disbursements at ports of loading and discharging. If Charterers or their Agent agree to advance funds on Owners' behalf, there shall be an advancing commission of ~~3~~ 2%. Any such advance and commission shall be deducted by Charterers from the initial or final freight payment. Any time lost due to failure of Owners to arrange payment of disbursements on time, or while waiting for Charterers advance to arrive, shall not count as laytime or time on demurrage. Charterers may at their discretion not effect any advances unless the vessel has been accepted for loading.

**LIGHTERA-GE / DRAFTS**

6.    The cargo shall be brought alongside and taken from alongside free of expense to the Vessel, any custom of the port to the contrary notwithstanding. Owners guarantee that the vessels draft will not exceed drafts warranted by Charterers (see lines 9-10, 20-21 & Clause 9) at load and discharge ports without Charterers express prior approval. If Charterers permit vessel to exceed warranted drafts then all lighterage at ports of loading and discharging, if necessary, shall be at Owners' time, risk and expense. Otherwise, lighterage is to be in Charterers' option and for Charterers' account. ~~Charterer shall have the option to load or discharge onto barges or lighter vessels either at berth or anchorage. Owner shall allow supervisory personnel onboard, if required, including mooring master and Charterers Inspector.~~
It shall be Owners' responsibility to arrive and sail on the basis of prevailing drafts. Notice of Readiness may not be tendered at load or discharge ports if the Vessel is deeper than the drafts warranted by Charterers. If the Vessel cannot complete loading at the place designated by Charterers by reason of her draft, she shall proceed to a place indicated by the Shippers and there complete her loading.

**DRAFT SURVEYS & TALLY**  7.    For the purpose of performing draft surveys, the Vessel is to furnish a certified calibration scale for all tanks, including fore and aft peak tanks, double bottom tanks, and deep tanks, if any. The Vessel shall clearly and accurately cut and mark on shell plating Plimsol and other draft marks amidships, and draft marks at the bow and stern on port and starboard sides. Vessel is to furnish Charterers or their Agent or Surveyor a capacity plan, displacement scale, deadweight scale and any other hydrostatic information required by the draft surveyors. The Vessel shall have on board all up to date, accurate and valid documents necessary to perform a proper and accurate draft survey. The Master must certify that all documents supplied are correct. At preliminary survey, the total quantities of ballast, bunkers, stores, etc. are to reasonably agree with the deadweight indicated on the deadweight scale. Vessel's trim when conducting draft surveys to be within the range covered by calibrated trim tables. Upon request by the Charterers or by the independent inspector nominated by Charterers Owners/Master to submit copies, *if available,* of the last 6 draft surveys performed on the vessel. The Owners shall be liable for all loss, damage and expenses caused by the Vessel or Master's failure to comply with this Clause 7. Time lost by reason of such failure shall not count as laytime or time on demurrage. Any Tally on ship or shore side whether compulsory or not at loading & discharging ports shall be for Owners / Charterers account respectively.

**CLEANING**  8.    The Vessel shall tender at every load port with holds and hatches washed down with fresh water, clean and dry, free of *loose* rust *scale* and without any ~~trace~~ *residues* of previous cargo. Prior to commencement of loading, the Vessel shall present a certificate issued by an independent surveyor appointed by Charterers certifying that Vessel's holds, hatches, hatch covers and hatch coamings are suitable for the carriage of cargo in accordance with this Clause 8. If the Vessel is unable to pass inspection, Owners shall arrange to clean the Vessel with utmost despatch at Owners time and expense, using Vessel's crew, or, if required by local regulations, using shore labor. Without prejudice to the requirements of this clause 8, Charterers shall have the right to inspect the Vessel at any time prior to loading *in accordance with ISPS regulations.*
*Owners confirm they are familiar with the strict hold/hatch/hatchcover condition requirements applying for the loading/carriage/discharge of bulk urea which are as strict as the ones for bulk alumina/grain.*

**COMPLYING WITH LAWS**  9.    *Without prejudice to its rights under paragraph 9 of the Charter party, Charterer's shall have the right to inspect the vessel at any other time prior to loading in accordance with ISPS regulations.* Owners warrant the Vessel on the date of and throughout the term of this Charter, shall be eligible for trading within, to and from the ranges, ports and places specified for the voyage and in full compliance with all laws and regulations of all port authorities and of all other governmental authorities having jurisdiction, as interpreted  and applied by such authorities, which apply to the Vessel or which regulate loading or discharging as contemplated in this Charter and have on board all valid certificates, records, licenses and other documents necessary to load the contracted cargo or otherwise required for the voyage under the Charter. Any delays, losses, expenses or damages as a result of the failure of the Vessel to comply with the foregoing requirements shall be for Owner's account and any time lost shall not count as laytime or time on demurrage. Any expenses to obtain eligibility or to come into compliance or incurred due to non-eligibility or non-compliance shall be for Owners' account. Owners warrant that the Vessel has not entered and will not enter any port in violation of any applicable restrictions of any government having jurisdiction.

**OVERTIME**  10.    Overtime shall be for account of party ordering same.
If ordered by the Owners, all overtime, including customs overtime and overtime for Stevedore labor, crane operators and shore personnel necessary for loading and discharging operations and placing or taking cargo away from alongside the Vessel, shall be for Owners' account.
If ordered by the Charterers, all overtime for Stevedores, crane operators and shore personnel shall be for Charterers' account. Should the Port Authorities order compulsory overtime then costs to be ~~split 50/50 between Owners and~~ *for* Charterers *account.* ~~Charterers shall have the right to deduct actual / estimated cost of overtime from the final freight payment.~~ Overtime for Officers or Crew shall always be for Owners' account, regardless of who orders overtime.

| VESSEL DETAILS | 11. | DESCRIPTION | 23. |
|---|---|---|---|

The Vessel performing under this Charter will be the M.V. *"PONTOKRATIS"* and shall, on the date of and throughout the Vessel's service under this Charter, have the following characteristics – *all details about* - :-

| | |
|---|---|
| Ex Name ............................. : | *n/a* |
| Type ................................... : | *self trimming bulk carrier* |
| Flag .................................... : | *Cyprus* |
| Built ................................... : | *1981* |
| IMO Number ...................... : | *8000252* |
| DWAT................................. : | *29,198 mt* |
| Draft SSW ..........................: | *10.666 m* |
| DWCC ................................ | |
| LOA / BM ........................... : | *179.873 / 23.10 m* |
| GRT / NRT ......................... : | *16933 / 10893* |
| Grain / Bale capacity .............. : | *34,763.2 / 32,385.8 cbm* |
| No of Ho / Ha ..................... : | *6 / 6* |
| Type of Hatch covers ............. : | *McGregor single pull* |
| Location of Br / Er ..................: | *aft* |
| Cargo Gear ......................... : | *cranes 5 x 25 ts  /  8.50m outreach* |
| Hatch Dimensions ................. : | *1) 8.22  2) 13.025  3-6) 15.200 all by 9.60 m* |
| Hold Dimensions ................... : | *1) 15.49x6.25-15.41x13.62  2) 18.73x15.54-16.14x13.61* |
| | *3/4) 22.40x16.14x13.62  5) 23.20x16.14x13.61* |
| | *6) 22.15x16.14-12.70x13.61-12.86* |
| Average speed ...................... : | *about 13 k* |
| Class .................................. : | *ABS* |
| TPI/C mts per in/cm .............. : | *36.33 mt/cm at SW summer draft* |
| Call sign/Satcom .................. : | *P3VM2 / 421091111* |
| Dist W/Line-top of h/cmng ...... : | *max about 9.5m fully ballast* |
| Max air draft ....................... : | *30.262 m ln full ballast* |
| Last dry-dock/special survey ..... : | *DD April 2006* |
| Depth moulded/L.B.P. ...... : | *14.50 / 170.00 m* |
| Last three cargoes ................. : | *wheat / alumina / rapeseeds* |
| Head Owners P & I Club ......... : | *The United Kingdom Mutual Steamship Assurance Association Ltd, Bermuda* |
| Disponent Owners P & I Club ... : | *n/a* |
| Hull & Machinery Value .......... : | *US$ 5 million* |
| Vessel's position .................. : | *Piraeus undergoing continual annual survey. ETR 3-4th April. ETA loadport 6-7th April 2009 Wp AGW UCE* |
| Head Owners / Carriers full style. : | *Folkstone Maritime Ltd., Nicosia, Cyprus* |
| Disp Owners / Carriers full style . : | *n/a* |
| Managers' full style ............... : | *Ocean Freighters Ltd., Piraeus, Greece* |
| Fixed/removable stanchions........: | *no* |

*Owners confirm: that no encumbrances/liens/arrest orders or recommendations are pending.*
*that vessel not detained by port state control during preceding 36 moths*

| VOYAGE SPEED | Owner warrants that the vessel will perform under this Charter at the average speed advised to Charterer, weather and safe navigation permitting. |
|---|---|

| CLASS & P&I & SUITAB- ILITY | On the date of and throughout the Vessel's service under this Charter: the Vessel shall be classed ~~A-1 American Bureau of Shipping or 100-A-1~~ *highest* Lloyds or equivalent *IACS*; Owners shall have, at no cost to Charterers, full and valid Protection and Indemnity (P&I) Insurance for the Vessel placed with a P&I Club which is a member of the International Group of P&I Clubs *throughout the entire voyage* and, if requested by Charterers', shall promptly furnish proper evidence of such insurance; the Vessel shall be tight, staunch and strong, well and efficiently manned, stored and victualled and in every way fitted for the voyage with her hull, machinery and equipment in a thoroughly efficient state, so far as due diligence can make her; the Vessel shall be suitable in all respects to load, carry and discharge the cargo specified in this Charter; the vessel has no center line beams or bulkheads or obstructions in the holds; the vessel shall be in every respect *absolutely* suitable for trading within, to and from the ranges, ports and places specified for the voyage and for the loading, carriage and discharge of the contracted cargo, which Owners have checked and confirm. |
|---|---|

| | |
|---|---|
| **ISM CODE** | The requirements of the International Safety Management (ISM) Code are hereby incorporated into the terms of this Charter party. Owners warrant that on the date of and throughout the Vessel's service under this charter, a Safety Management System (SMS) in accordance with the ISM Code will be in operation; that they (or the Company as defined by the ISM Code) shall have a valid Document of Compliance (DOC), and the vessel shall have valid Safety Management Certificate (SMC). Non-compliance with the requirements of the ISM Code shall be deemed a material breach of the Charter party. In the event of any delay, direct or otherwise, to the vessel caused directly or indirectly by non-compliance with the requirements of the ISM Code, laytime or time on demurrage shall not count.<br>*Issuance of DOC: 27th May 2007*<br>*issuance of SMC: 19th June 2008* |
| **IF NOT A BULK CARRIER** | *If the performing vessel is not a bulk carrier*: Owners represent and warrant to Charterers that the vessel is not a "Bulk Carrier" as defined in the ISM Code and therefore the vessel need not comply with the ISM Code until July 1st 2002. Owners shall be responsible for any loss, liability and expense which Charterers incur by reason of a breach of this warranty.<br>*Owners confirm performing vessel to be selftrimming single deck bulk carrier, steel floored.* |
| **DRY DOCKING, SCRAPPING AND DEVIATION** | Owner warrants that the vessel was not in dry dock or undergoing repairs at the time of fixture and shall not dry dock or undergo repairs prior to the completion of the voyage, and that the vessel is not destined for scrapping upon completion of the voyage. Owner warrants that, prior to the conclusion of this Charter, Owner has advised Charterer of: (I) the vessel's complete itinerary at the time of fixing; (II) cargo(s) on board at time of fixing; (III) the ports where such cargo(s) will be discharged prior to loading Charterers cargo(s); and (IV) bunkering or repairs planned by the vessel prior to or after loading Charterers cargo(s).<br>*Owners confirm performing vessel not in drydock / undergoing repairs between fixture and laydays.* |
| **CONDITION** | The above terms and description outlined in this clause are to be regarded as conditions, so that the breach entitles Charterers, in Charterers' option, to terminate the Charter and/or to recover damages, without prejudice to any other remedy that Charterers may have in law or in equity. Any delays, losses, expenses or damages as a result of Owner's breach of any warranty or any other obligation under this Charter, shall be for Owner's account and any time lost as a result of such breach, including, but not limited to, time lost due to vessel losing its place in the berthing rotation, shall not count as laytime or time on demurrage. |
| **MATES' RECEIPTS** | **12.** The Master or Officer in charge shall give mate's receipts for cargo loaded if so required, said receipts to be surrendered on proper completion of Bills of Lading, if required.<br>*Charterer's option vessel to have Mate's receipts issued only at laoding port in which case Bills of Lading to be signed by Trammo Navigation. Such Bills of Lading to be always in strict conformity with Mate's receipts in so far as the material cargo is concerned.* |
| **TRIMMING/ HATCHES/ STEVEDORE** | **13.** Cargo shall be loaded and discharged by Charterers. Charterers shall only pay for the trimming which the loading facilities can actually achieve. Any extra leveling, trimming or filling (if required by the Vessel, Master or loading facilities) to be at Owners' expense and time used for same not to count as laytime or time on demurrage. Such work shall be accomplished by Vessel's crew, provided local regulations permit. Charterers will not be responsible for dead freight if it is not physically possible to fill all spaces with the loading appliance. All opening and closing of hatches at each port shall be for Vessel's time and account *provided local regulations permit otherwise to be for Charterer's account*. The Master shall cover the hatch of each hold as soon as loading into same is finished, and also all hatches when loading or discharging is finished for the day or if the weather is wet or threatening. ~~Laytime shall not count where loading or discharging is suspended due to threatening weather~~. The Master shall also keep covered all hatches in which loading or discharging is not actually being performed. The Charterers, Suppliers or Receivers shall appoint Stevedores for loading and discharging. Charterers shall not be responsible for any negligence, default or error of Stevedores or for any resulting loss, damage or claims including, but not limited to claims with respect to the cargo or the vessel. All claims arising from any negligence, default or error of Stevedores to be settled directly between Stevedores and Owners. *But Charterer's to assist in obtaining settlements*<br>*Vessel to be left in a seaworthy trim between ports/berths.* |

TA-1 (AG) (2000.02)                  Page 6/13

**CALCULA-TION OF LAYTIME**

## 14. CALCULATION OF LAYTIME

**A.**    Cargo shall be loaded at the rate of *10,000* metric tons per weather-working day of 24 consecutive hours, ~~Fridays,~~ Saturdays, Sundays and holidays excepted *included* provided Vessel can receive and deliver at these rates.

Cargo shall be discharged at the rate of    *2,500* metric tons per weather-working day of 24 consecutive hours, ~~Fridays,~~ Saturdays, Sundays and holidays excepted *included,* provided Vessel can receive and deliver at these rates.

**B.**    ~~At loading ports, time from 5 P.M. / noon Wednesday / Thursday / Friday / Saturday or noon / 5 P.M. the day before a holiday, until 8 A.M. Saturday / Monday or the day after a holiday, not to count as laytime, even if used~~

~~At discharging ports, time from 5 P.M./ noon Wednesday / Thursday / Friday / Saturday or noon / 5 P.M. the day before a holiday, until 8 A.M. Saturday / Monday or the day after a holiday not to count as laytime, even if used~~

**C.**    At loading port(s), laytime to commence *12 hours* after Vessel has given valid written notice *by email/fax/telex/cable* to Charterers' Agent that she has received free pratique, is ready to receive cargo, and has received the independent surveyor's certificate of cleanliness required by Clause 8, at ~~14:00 hours if such notice has been given before noon and at 08:00 hours the next working day if such notice is given during office hours at or after noon.~~ Said notice at the first loading port may not be tendered prior to 08:00 hours on the first layday specified in the second sentence of Clause 1.

Laytime at discharging port(s) to commence *12 hours* after Vessel has received free pratique and has given valid written notice to Charterers' Agent that she is ready to discharge at the place ordered ~~at 14:00 hours if such notice has been given before noon and at 08:00 hours the next working day if such notice is given during office hours at or after noon.~~

Any time prior to commencement of laytime shall not count as laytime, even if used for loading or discharging. Laytime for loading and discharging to stop on completion of physical cargo operations. The notices described in this Clause 14C, are referred to in this Charter as "Notice of Readiness.". *Provided Charterers/Shippers arrange for all necessary documents within maximum 4hours after completion of loading operations.*

**D.**    If, upon arrival at ports of loading or discharging, the Vessel cannot enter port due to congestion, the Master may tender Notice of Readiness by telex, fax, cable or radio *or email* to Charterers' Agent *whether in port or not, whether in berth or not, whether in custom clearance or not, whether in free pratique or not.*

**E.**    If, after tendering a Notice of Readiness, the Vessel fails to obtain free pratique or customs clearance, or is for any reason whatsoever unfit or not fully ready to load or discharge the cargo, then the Notice of Readiness shall be invalid, and time shall not count as laytime or time on demurrage until after the Vessel is ready in all respects to load or discharge cargo and has tendered a valid Notice of Readiness, after which laytime will commence in accordance with Clause 14C, unless the Vessel loses its place in the loading or discharging lineup, in which case laytime will not commence until the Vessel has been fully secured alongside the loading or discharging facility.

**F.**    Time used shifting within a port (whether between berths or between anchorage and berth) or waiting for pilots shall not count as used laytime or time on demurrage. *Any shifting expenses between first loading berth/anchorage to second loading berth/anchorage to be for Owners account but time used to count as laytime.*

**G.**    Time during which the Vessel is unable to load or discharge in accordance with this Charter shall not count as laytime or time on demurrage.

**H.**    Time during periods of bad weather (regardless of severity), night restrictions, ice conditions, or tidal restrictions, surf or swell, high humidity shall not count as laytime.

**I.**    All notices at loading and discharging ports shall be given *any time day or night SHINC.* ~~during office hours only. Office hours are deemed to be 0800-1700 Monday to Friday and 0800-1200 Saturday except in Constanza where office hours are 0800-1500 Monday to Friday and in Muslim countries where Friday is the official weekly holiday, office hours are deemed to be 0800-1700 Saturday to Wednesday and 0800-1200 on Thursday.~~

**J.**    ~~Charterers have the option to average or to reverse laytime.~~
*Laytime to be non-reversible.*

**OTHER LAYTIME MATTERS**

**DEMURAGE** 15.    In case the Vessel is longer detained by the Charterers or their Agent and the detention is not excused by Clause 4 or otherwise, demurrage shall be paid at the rate of :-U.S. $ *8,000*  per day for every running day so detained and proportionately for any part of a day.

**DESPATCH** Owners shall pay Charterers at the rate of:- U.S. $ *4,000*   per day despatch money for working time saved in loading and discharging, portions of days to count pro-rata.

**AGENTS** 16.    Charterers shall have the right to nominate agents at all ports.  If Charterers elect to do so, Owner shall appoint and pay for the agents nominated by Charterer, and such agents shall be Owner's agents for all purposes under this Charter.

<u>Agents at port of loading:-</u>                    <u>Agents at port of discharge:-</u>

*to be advised*                                    *to be advised*

**CARGO BEAMS** 17.    Cargo beams, boards and battens which Charterers or Shippers may deem necessary to be removed in order not to impede loading or discharging operations shall be removed by Owners at Owners' time and expense before commencement of loading, but in any case, Charterers are not to be responsible for damage to cargo beams, boards and battens.  Before loading, all tunnels, tank tops and bilge's must be properly covered and protected, at Owners' time and expense.  ~~If the independent surveyor or the Suppliers require Kraft paper or similar covering material to be laid on Vessel's tank tops and/or sides for the protection of bagged cargo, Owners shall pay for the covering material and for the cost of laying it.  Time used in laying the covering shall not count as laytime or time on demurrage.~~

**GRAB DISCHARGE** 18.    Vessel is guaranteed to have steel floors, tank tops and ceilings and to be *absolutely* suitable in all respects for grab discharge.  No cargo shall be loaded in deep tanks, in bridge space, nor in any other place not accessible for discharge by means of mechanical grabs.  Nevertheless, should any cargo be loaded by the Vessel in places not accessible to grabs, any time lost removing cargo from such places shall not count as laytime or time on demurrage, and all expenses above the cost of normal grab discharge at port of discharge shall be for Owners' account.  Deep tanks, tunnels and all other provisions within Vessel's holds are to be adequately protected against damage by Stevedores' grabs, failing which Owners shall be responsible for all consequences.

**VESSELS GEAR** 19.    At ports of loading and discharging, Vessel is to furnish full use of tackles, cranes, derricks winches and grabs if on board with necessary steam or power to operate same, free ·of expense to Charterers, Shippers or Receivers. The Vessel shall give free use of electric lights *as on board* as required in holds or on deck.  Cargo gear shall be in good working condition, with sufficient power available to operate same, fully and up to date certified, and shall be capable of lifting            **25**     metric tons in single gear.  Shore winchmen, if used, shall be for Charterers' account at loading and discharging ports. The Vessel shall be responsible for the removal of hatch beams prior to discharge.  Owners guarantee that the Vessel's cargo gear shall be able to serve all hatches and that the Vessel shall be able to work all cargo gear ~~simultaneously at all times.~~ - Any cost incurred, including use of shore cranes or Stevedore standby time, etc., due to malfunction or unavailability or inadequacy of the Vessel's cargo gear shall be for Owners' account and time lost thereby shall not count as laytime or time on demurrage.

| | | |
|---|---|---|
| **STOWAGE** | **20.** | ~~Separate stowage of different grades shall be for Owners' account, such separate stowage to be by natural compartments only, and quantities to be suitable to capacity of compartments and Vessel's trim. Charterers to submit to Owners or Master a cargo breakdown on receipt of Master's 10 days notice of arrival. The Master shall promptly review same and shall give notice to Charterers that hold separation can be maintained. If hold separation is not possible on proposed cargo breakdown, then Charterers to adjust stowage. Alternatively, Charterers shall make arrangements, at Charterers' expense, for proper artificial separations. Vessel is to be left in seaworthy trim, to Master's satisfaction, when shifted between ports or berths.~~ |

**DUES & TAXES**　**21.**　Dues or taxes on cargo to be for Charterers' account *both ends*. Customary port charges, including berthing expenses, to be for Owners' account. All other taxes and dues on the Vessel or the freight at load and discharge ports to be for Owners' account *both ends* including dues or taxes which are calculated on the quantity of cargo loaded or discharged. Charterers shall not be responsible to pay or to reimburse Owner for any taxes on income attributable to transportation under this Charter.

**WHARFAGE**　**22.**　Any wharfage on cargo to be for Charterers' account. Any wharfage or dockage on the Vessel to be for Owners' account. Owners shall not be relieved of liability to pay berthing expenses under Clause 21 and wharfage or dockage on the Vessel even if such charges are calculated on the basis of the quantity of cargo loaded.

**EXTRA INSURANCE**　**23.**　~~Any extra premium of insurance on cargo paid by Charterers due to Vessel not being classed A-1 American Bureau of Shipping or 100-A-1 Lloyds or not having an equivalent class, or in respect of Vessel's age, size, flag or ownership, to be paid by Owners to Charterers. However Owners to contribute US$ _____ which Charterers shall have the right to deduct from the initial or final freight.~~
*Vessel to be free of extra insurance due to age.*

**LIEN**　**24.**　All liability of Charterers and Shippers, of whatsoever nature and whensoever arising, except for freight, dead freight and demurrage, shall cease on shipment of the cargo. The Master and Owners shall have an absolute lien on the cargo for all freight, dead freight and demurrage due to the Vessel under this Charter.

**ASIGNMENT**　**25.**　Charterers have the right to re-let or sub-charter the vessel or to assign or transfer all or part of this Charter, but in such case, the original Charterers shall remain responsible for the right and true fulfillment of same.

**CHARTERER RESPONSIBILITY**　**26.**　The Pilot, Master, Officers and crew of the Vessel or any Stevedore or any towboat person or facility assisting the Vessel shall not be agents or employees of the Charterers and the Charterers shall not be liable for any loss, damage or claims, including, but not limited to loss, damage or claims with respect to the cargo or the vessel, resulting from or arising out of negligence, default or error of any of them.

**OWNERS' RESPONSIBILITY**　**27.**　The Master and Owners shall be responsible for the quantity of cargo loaded as per Bills of Lading. Upon the request of Charterers or Shippers, the Master shall issue, sign and deliver Bills of Lading as presented without prejudice to this Charter for goods actually loaded on board the Vessel, whether or not loading is completed. The Owners and the Vessel shall be responsible for any damage to cargo or delay caused by leakage of water or oil through ventilators, pipes, valves, tanks, hatches or other equipment on board or for any other damages or delay caused by lack of due diligence.

**ITF COMPLIANCE**  28.  Owners warrant that prior to presentation for loading under this Charter and throughout the duration of the voyage, the members of the Vessel's crew will be employed under terms acceptable to the International Transport Workers Federation and associated organizations. Any time lost or expenses incurred due to a failure to comply with this Clause 28 shall be for Owners' account.

**POLLUTION**  29.  ~~Owners warrant (a) to have secured and always to carry aboard the Vessel a valid U.S. Coast Guard Certificate of Financial Responsibility (Water Pollution) as required under the Federal Water Pollution Control Act, as amended; and (b) that at all times during the voyage, pollution insurance covering the Vessel shall be in force and the Vessel shall carry on board evidence thereof. Time lost as a result of Owners' failure to comply with these warranties shall not count as laytime or time on demurrage, and Owners agree to indemnify Charterers for any loss or liability arising from such failure.~~

**SAFETY**  30.  ~~If the Vessel calls at any U.S. port for purposes of loading or discharging cargo or embarking or disembarking passengers, Vessel's cargo gear and all other equipment shall comply with regulations established under 33 United States Code §941 (Safety Rules and Regulations for Longshoremen). If longshoremen are not permitted to work due to failure of the Master or Owners' Agent to comply with the aforementioned regulations, any delay resulting therefrom shall not count as laytime or time on demurrage, and any Stevedore standby time shall be for Owners' account.~~

**BILL OF LADING**  31.  The discharge port shown in the Bill of Lading does not constitute a declaration of discharge port. Charterers shall have the right to order the Vessel to any port within the terms of this Charter. Charterers hereby indemnify Owners against claims brought by holders of Bills of Lading against Owners by reason of change of destination. Should original Bill of Lading not arrive at discharging port in time, then Owners to release the entire cargo without presentation of the original Bill of Lading after receiving written authority from Charterers and, if required by Owners, ~~in~~ Charterers *solely shall issue and sign* ~~option~~ a Letter of Indemnity in the *Owner's P&I club wording* ~~form attached, which may be issued by either Charterers or Receivers~~, without a bank guarantee, *sub viewing same*. Master hereby authorizes Charterers or their agents, in Charterers' option, to issue and sign Bills of Lading on his behalf in ~~accordance~~ *strict conformity* with Mate's or Tally Clerk's receipts.  Charterers shall have the option to exchange Bills of Lading *at Charterer's office in Tampa against Owner's authority to Messrs Trammo Navigation to sign on Owner's/Master's* or split *the initial* Bills of Lading to smaller quantities, *or print freight rate on new Bills of Lading which can be different from the one agreed provided first set of Bills of Lading destroyed and new set(s) to be issued after Owners prior consent/authorization.* Any Bill of Lading issued under this Charter Party shall be deemed to contain the following clause:

> *Charterer's option to put one original Bill of Lading on board with Master, against which entire cargo shall be discharged at destination upon Charterer's confirmation. One original Bill of Lading retained on board against which bill delivery of cargo may be properly be made on instructions received from Shippers/Charterers*

"ALL TERMS CONDITIONS, LIBERTIES, EXCEPTIONS, CLAUSES AND PROVISIONS OF THE CHARTER PARTY DATED:- *1st April 2009* BETWEEN:- *"FOLKSTONE MARITIME LTD., NICOSIA, CYPRUS"* AND *"TRANSAMMONIA AG., ALTENDORF, SWITZERLAND"* INCLUDING BUT NOT LIMITED TO ALL CLAUSES AND PROVISIONS WITH RESPECT TO ARBITRATION AND GOVERNING LAW, ARE HEREBY INCORPORATED BY REFERENCE INTO THIS BILL OF LADING."

Unless instructed otherwise by Charterers, the Master shall not load any cargo that is damaged, contaminated or otherwise unsuitable for loading and which may prejudice the signing of clean on board Bills of Lading and shall request sound cargo

32    LIMITATIONS OF LIABILITY

**COGSA**  A.    This Charter and all bills of lading issued hereunder shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States (46 United States Code §1300--1315) which is incorporated by reference in this Charter and in all bills of lading issued hereunder. The aforesaid provisions (except as may be otherwise specifically provided herein) shall govern before the goods are loaded on and after they are discharged from the Vessel and throughout the entire time the goods are in custody of the Owners or of the Vessel.

**FIRE**  B.    Neither the Vessel nor Owners nor any corporation owned by, subsidiary to or associated or affiliated with the Vessel or Owners shall be liable to answer for or make good any loss or damage to the goods occurring at any time, even though before loading on or after discharge from the Vessel, by reason or by means of any fire whatsoever, unless such fire shall be caused by the Owners' design or neglect.

| STATUTES | C. | Any provision of this Charter to the contrary notwithstanding, the Owners shall have the benefit of all limitations of and exemptions from liability accorded to the Owners or Chartered Owners by any statute or rule of law for the time being in force.  The amount of the Owners' liability hereunder for or in connection with any cargo transported shall not exceed the value of the Owners' interest in the Vessel and pending freight. |
|---|---|---|

| CLAIMS BY OWNERS | D. | Charterer shall be discharged and released from all liability with respect to any claim Owner may have under this Charter (including, but not limited to claims for dead freight), and all such claims shall be waived and absolutely barred, unless (a) Master gives written notice to Charterer and Shippers or Receivers of such claim before the vessel sails from the port at which the claim arose and (b) full documentation of such claim is received by Charterer within ~~60~~ *90* days.  Any claim for dead freight must be supported by an independent surveyor's report. |
|---|---|---|

| ARBITRA-TION | 33. | Any and all disputes of whatsoever nature arising out of or relating to this Charter, or to the making, performance or termination hereof, or to any Bill of Lading issued hereunder, shall be referred to the arbitration of three persons in London, one to be appointed by the Owners, one to be appointed by the Charterers, and the third by the two so chosen, who shall be the chairman.  A party must appoint its arbitrator within 20 calendar days of appointment of the first appointed arbitrator, failing which the first appointed arbitrator shall become the sole arbitrator.  The third arbitrator must be appointed within 20 days of appointment of the second arbitrator, failing which the third shall be appointed by the President of the London Marine Arbitrators Association on the request of either party appointed arbitrator. Any dispute is to be referred to arbitration within nine (9) months of the completion of discharge.  Otherwise, a claim arising from the dispute is deemed waived and time barred.  If the amount in dispute is less than US$50,000, then (a) the dispute is to be referred to Arbitration under the "L.M.A.A. Small Claims Procedure"; (b) the arbitrator's decision is to be final and binding on both parties; and (c) the parties waive the right to appeal the arbitrator's decision. |
|---|---|---|

| COMMISION | 34. | An address commission of 3.75 percent on all freight, dead freight and demurrage, payable by Owners to Charterers is earned (Vessel lost or not lost) on the signing of Bills of Lading.<br>A brokerage commission of 1.25 percent is payable to Tillship Ltd., London on the signing of Bills of Lading. |
|---|---|---|

| GOVERNINGLAW | 35. | This Charter shall be governed and construed under English Law.<br>*G/A, arbitration in London, English law to apply.* |
|---|---|---|

| AMEND-MENTS & HEADINGS | 36. | This Charter may not be amended orally.  Any amendment must be in writing signed by the party to be charged.  Headings are for reference only and do not affect the meaning of any clause. |
|---|---|---|

| ATTACHED CLAUSES | 37. | General Clause Paramount/Bills of Lading Clause; P. & I. Bunkering Clause; Both-to-Blame Collision Clause; General Average Clause; New Jason Clause; Chamber of Shipping War Risk Clauses 1 and 2, *Clause 40* all as attached, are incorporated herein. |
|---|---|---|

| CONFIDEN-TIALITY | 38. | Charter party terms to be strictly private and confidential.<br>*Negotiations to be kept absolutely private and confidential by all parties concerned.*<br>I n   W i t n e s s   W h e r e o f , the parties hereto have caused this Charter to be executed as of the day and year indicated on the face hereof. |
|---|---|---|

F o r   t h e   O w n e r s :          F o r   t h e   C h a r t e r e r s :

By: _____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____



# TRANSAMMONIA

Attachment to Charter Party dated        *1ˢᵗ April 2009*                    of

M.V.        *"PONTOKRATIS"*

Between    *"FOLKSTONE MARITIME LTD., NICOSIA, CYPRUS"*             as Owners

and        *"TRANSAMMONIA AG, ALTENDORFF, SWITZERLAND"*            as Charterers.

*General Clause Paramount / Bills of Lading*

Bills of Lading issued under this Charter shall contain the following provision:
The Hague Rules contained in the International Convention for the Unification of certain rules relating to Bills of Lading, dated Brussels the 25th August 1924 as enacted in the country of shipment shall apply to this contract. When no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactment's are compulsorily applicable, the terms of the said Convention shall apply.

In trades where the International Brussels Convention 1924 as amended by the Protocol signed at Brussels on February 23rd 1968 - The Hague-Visby Rules - apply compulsorily, the provisions of the respective legislation shall be considered incorporated in this Bill of Lading.

All such Bills of Lading shall also provide that they are subject to all the terms, conditions, exceptions and exemptions whatsoever of this Charter, which shall govern the rights of the parties concerned in the Shipment. The Master, subject to the foregoing provisions, shall sign Bills of Lading as and when presented, provided same does not misrepresent the goods.

*Protection & Indemnity Bunkering Clause*

The Vessel, in addition to all other liberties, shall have liberty as part of the contract voyage and at any stage to proceed to any port or ports whatsoever, whether such ports are on or off the direct and/or customary route or routes to the ports of lading or discharge named in this Charter and there take oil bunkers in any quantity in the discretion of Owners even to the full capacity of fuel tanks, deep tanks and any other compartments in which oil can be carried, whether such amount is or is not required for the chartered voyage.

*General Average*

General average shall be adjusted, stated and settled according to York-Antwerp Rules 1994, (or any subsequent modification thereof) at such port of place in the United Kingdom as may be selected by the Owners and as to matters not provided for by these Rules, according to the laws and usage's at the port of England. In such adjustment, disbursements in foreign currencies shall be exchanged into United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the Vessel.

Average agreement or bond and such additional security, as may be required by the Owners, must be furnished before delivery of the cargo. Such cash deposit as the Owners or their Agents may deem sufficient as additional security for the contribution of the cargo and for any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees, or owners of the cargo to the Owners before delivery. Such deposit shall, at the option of the Owners, be payable in United States money, and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the place of adjustment in the name of the adjuster pending settlement of the general average, and refunds or credit balances, if any, shall be paid in United States money.

### *Both-to-Blame Collision Clause*

If the Ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or servants of the Carrier in the navigation or in the management of the ship, the owner of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set-off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the owners, operators or those in charge of any vessel or vessels or object other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

### *New Jason Clause*

In the event of accident, danger, damage, or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the cargo, shippers, consignees or the owners of the cargo shall contribute with the carrier in general average to the payment of any sacrifice, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the carrier or his Agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods to the carrier before delivery.

### *Chamber of Shipping War Risk Clauses 1 & 2*

1. No Bills of Lading to be signed for any blockaded port and if the port of discharge be declared blockaded after Bills of Lading have been signed, or if the port to which the ship has been ordered to discharge either on signing Bills of Lading or thereafter be one to which the ship is or shall be prohibited from going by the government of the nation under whose flag the Ship sails or by any other Government, the Owner shall discharge the cargo at any other  port covered by this Charter as ordered by the Charterers (provided such other port is not a blockaded or prohibited port as above mentioned) and shall be entitled to freight as if the ship had discharged at the port or ports of discharge to which she was originally ordered.

2. The Vessel shall have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or otherwise howsoever given by the government of the nation under whose flag the Vessel sails or any department thereof, or any person acting or purporting to act with the authority of such Government or of any department thereof, or by any committee or person having, under the terms of the War Risks Insurance on the Vessel, the right to give such orders or directions and if by reason of and in compliance with any such orders or directions anything is done or is not done, the same shall not be deemed a deviation, and delivery in accordance with such orders of directions shall be a fulfillment of the contract voyage and the freight shall be payable accordingly.

### *P & I Insurance Clause*

A.   Owners warrant that throughout vessel's service under this Charter, Owners shall have full and valid Protection & Indemnity Insurance (P & I Insurance) and valid excess liability insurance (Excess Insurance), if necessary or applicable, for the vessel with the P&I insurance placed with a P & I Club which is a member of the international group of P & I Clubs. The P & I Insurance and any excess insurance shall be at no cost to Charterers.

If required by Charterers, Owners shall promptly furnish to the Charterers proper evidence of Owners / Operators / Disponent Owners P & I Insurance immediately upon signing this Charter or at any time during the Charter term. The above warranty is to be regarded as an essential part of this Charter which is conditional on its truth or performance, so that its breach entitles the Charterer, in Charterers option, to terminate the Charter and/or to recover damages allowable in law.

### *P&I Bunker Deviation Clause 1948*

The vessel in addition to all other liberties shall have liberty as part of the contract voyage and at any stage thereof to proceed to any port or ports whatsoever whether such ports are on or off the direct and/or customary route or routes to the ports of loading or discharge named in this Charter and there take oil bunkers in any quantity in the discretion of owners even to the full capacity of fuel tanks, deep tanks, and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.

**Additional Clauses to Charter Party mv "PONTOKRATIS" dated 1ˢᵗ April 2009**


### Clause 40 – amended BIMCO ISPS Clause for Voyage Charter Parties:


A) (I) From the date of coming into force of the international code for the security of ships and of port facilities and the relevant amendments to Chapter XI of SOLAS (ISPS code) in relation to the vessel, the Owners shall procure that both the vessel and "the company" (as defined by the ISPS code) shall comply with the requirements of the ISPS code relating to the vessel and "the company". Upon request the Owners shall provide a copy of the relevant international ship security certificate (or the interim international ship security certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the company security officer (CSO).

(II) Except as otherwise provided in this charter party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the company" to comply with the requirements of the ISPS code or this clause shall be for the Owners account.


B) (I) The Charterers shall provide the CSO and the ship security officer (SSO)/master with their full style contact details and any other information the Owners require to comply with the ISPS code.

(II) Except as otherwise provided in this charter party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this clause shall be for the Charterer's account and any delay caused by such failure shall be compensated at the demurrage rate.


C) Provided that the delay is not caused by the Owner's failure to comply with their obligations under the ISPS code or clear grounds for believing the vessel is not in compliance, the following shall apply:

(I) Notwithstanding anything to the contrary provided in this charter party, the vessel shall be entitled to tender notice of readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS code.

(II) Any delay resulting from measures imposed by port facility or by any relevant authority under the ISPS code shall count as one half laytime or one half time on demurrage if the vessel is on laytime or demurrage.


D) Notwithstanding anything to the contrary provided in this charter party, any additional costs or expenses arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be equally divided between the Charterer and the Owner, unless such costs or expenses result from (I) the Owner's negligence; (II) the Owner's failure to comply with its obligations under the ISPS code, SOLAS Chapter XI or other regulations; (III) clear grounds for believing the vessel is not in compliance; (IV) measures required by the Owners to comply with the ship security plan, in which cases all such costs or expenses shall be for the Owner's account.


E) If either party makes any payment which is for the other party's account according to this clause, the other party shall indemnify the paying party.


For the Owners:                                    For the Charterers:


By: _____                      By: _____

Name: _____                      Name: _____

Title: _____                      Title: _____

EXHIBIT 2

⚓ **FOLKSTONE MARITIME LTD., Nicosia**

August 27, 2009

### *FREIGHT ACCOUNT*

| | | | |
|---|---|---|---|
| Vessel: | Pontokratis | Voyage: | 184 |
| Charterers: | Transammonia AG, Altendorf, Switzerland | CP date: | April 1, 2009 |
| Loading Port: | Yuzhny, Ukraine | Cargo: | Urea in bulk |
| Discharging Port: | Cai Lan, Vietnam | | |

| Particulars | | | | Debit USD | Credit USD |
|---|---|---|---|---|---|
| **Ocean Freight** | | | | | |
| Quantity per Bill of Lading | 24,495.312 | 45.00 per mt | 1,102,289.04 | 1,102,289.04 | 1,102,289.04 |
| | | | | | |
| **Despatch** | | | | | |
| Despatch at loading - Yuzhny | 1.671753 days @ USD 4,000 | per day pro rata | 6,687.01 | | 6,687.01 |
| Demurrage at disch - Cai Lan | 3.867153 days @ USD 8,000 | per day pro rata | 30,937.22 | 30,937.22 | |
| | | | | | |
| **Commissions** | | | | | |
| Commission - on freight | 5.00% | 55,114.45 | | | |
| Commission - on demurrage | 5.00% | 1,546.86 | | | |
| Commissions | | 56,661.31 | | | 56,661.31 |
| | | | | | |
| Berthage at 1, 6 & 7 | | USD 18,603.78 | | | |
| Pilotage | | USD 1,239.50 | | | |
| Bunkers consumed for shifting | | USD 3,530.56 | | | |
| Hire of 2 cranes | | USD 25,885.00 | | | |
| Warping Expenses at Cai Lan | | USD 2,990.19 | | | |
| Vessel's detention at Yuzhny | | USD 1,111.11 | | | |
| TOTAL | | USD 53,360.14 | | 53,360.14 | |
| | | | | | |
| **Charterers' Remittance** | | | | | |
| payment no. | Date | Currency | Amount | | |
| 1 | 15/Apr/2009 | USD | 992,052.14 | | |
| 2 | 04/Aug/2009 | USD | 70,686.38 | | |
| 3 | 26/Aug/2009 | USD | 1,103.11 | | |
| | | | | | 1,063,841.63 |
| **Subtotal** | | | | 1,186,586.40 | 1,127,189.96 |
| **Balance due to Owners** | | | | | 59,396.45 |
| **GRAND TOTAL** | | | | 1,186,586.40 | 1,186,586.40 |

Please remit to:
Royal Bank of Scotland Plc
Piraeus Branch - Greece
Swift: RBOS GRAA
IBAN # GR 10.0640.0010.0000.0050.0118.010
A/C No. 500118 USD 010
Favour : SATURNUS MARITIME S/A
Ref: pk-v184 Transammonia

E. & O E

EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
FOLKSTONE MARITIME LTD.,

                                    Plaintiff,              09 CV

-v-

TRANSAMMONIA AG,                              **ATTORNEY'S DECLARATION
                                             THAT DEFENDANT CANNOT BE
                                             FOUND IN THE DISTRICT**
                                    Defendant.
-----------------------------------------------------------------x

  This declaration is executed by **George M. Chalos, Esq.**, counsel for the Plaintiff,

FOLKSTONE MARITIME LTD., in order to secure the issuance of a Summons and Process of

Maritime Attachment and Garnishment in the above-entitled, in personam, Admiralty cause.

  Pursuant to 28 U.S.C. §1746, **George M. Chalos, Esq.**, declares under the penalty of

perjury:

  I am a Member of the firm of CHALOS & CO, P.C., attorneys for Plaintiff in the above

referenced matter.

  I am familiar with the circumstances of the Verified Complaint, and I submit this

declaration in support of Plaintiff's request for the issuance of Process of Maritime Attachment

and Garnishment of the property of the defendant, TRANSAMMONIA AG, pursuant to Rule B

of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of

Civil Procedure.

  I have personally inquired or have directed inquiries into the presence of the defendant in

this District.

  I have personally checked with the office of the Secretary of State of the State of New

York, using the Secretary of State's Division of Corporations database, and I have determined

that, as of September 10, 2009, the defendant is not incorporated pursuant to the laws of New

York, and have not nominated any agent for the service of process within the Southern District of New York.

I have inquired of Verizon Telephone Company whether the defendant can be located within this District. The Verizon Telephone Company has advised me that the defendant does not have any telephone number listings within this District.

I have further consulted with several other telephone directories on the internet, and I have found no separate telephone listings or addresses for the defendant within this District.

I have engaged in a Google search as to whether the defendant can be located within this District. The Google search results did not provide any information that defendant is found in this District.

I am unaware of any general or managing agent(s) within this District for the defendant.

In that I have been able to determine that the defendant has not appointed an agent for service of process within the Southern District of New York and that I have found no indication that the defendant can be found within this District for the purposes of Rule B, I have formed a good faith belief that the defendant does not have sufficient contacts or business activities within this District and does not have any offices or agents within this District to defeat maritime attachment under Rule B of the Supplemental Rules for Admiralty and Maritime Claims as set forth in the Federal Rules of Civil Procedure.

It is my belief, based upon my own investigation that the defendant, TRANSAMMONIA AG, cannot be found within this District for the purposes of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

Dated: Oyster Bay, New York
       September 10, 2009

                         CHALOS & CO, P.C.
                         Attorneys for Plaintiff
                         FOLKSTONE MARITIME LTD.

                  By:    _____
                         George M. Chalos (GC-8693)
                         123 South Street
                         Oyster Bay, New York 11771
                         Tel: (516) 714-4300
                         Fax: (866) 702-4577
                         Email: gmc@chaloslaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
FOLKSTONE MARITIME LTD.

                                        Plaintiff,            09 CV

-v-
                                                        **VERIFICATION OF**
TRANSAMMONIA AG                                          **COMPLAINT**

                                        Defendant.
-----------------------------------------------------------------x

      Pursuant to 28 U.S.C. §1746, GEORGE M. CHALOS, Esq., declares under the penalty of perjury:

      1.      I am a Member of the law firm of CHALOS & CO, P.C., counsel for the

Plaintiff, FOLKSTONE MARITIME LTD., herein;

      2.      I have read the foregoing Verified Complaint and know the contents thereof; and

      3.      I believe the matters to be true based on documents and information obtained

from employees and representatives of the Plaintiff through its agents, underwriters and attorneys.

      4.      The reason that this verification was made by deponent and not by the Plaintiff is

because Plaintiff is a foreign corporation, whose officers are not in this district, and whose

verification cannot be obtained within the time constraints presented by the circumstances of this

case.

      I declare under penalty of perjury that the foregoing is true and correct.

Dated: Oyster Bay, New York
       September 10, 2009

                             CHALOS & CO, P.C.
                             Attorneys for Plaintiff
                             FOLKSTONE MARITIME LTD.

By:        _____
                             George M. Chalos (GC-8693)
                             123 South Street
                             Oyster Bay, New York 11771
                             Tel: (516) 714-4300
                             Fax: (866) 702-4577
                             Email: gmc@chaloslaw.com